1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                        EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| BECKY GREER, TIMOTHY C. BUDNIK, ROSARIO SAENZ, IAN CARTY, HALEY MARKWITH, MARCIA GARCIA PESINA, AND MONICA MULDROW, individually and as class representatives,<br><br>Plaintiffs,<br><br>v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY, IBEW LOCAL 1245, and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 1:15-cv-01066-EPG<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT IBEW LOCAL 1245'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT AND DEFENDANT PG&E'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION AND REQUEST FOR ADDITIONAL BRIEFING<br><br>(ECF Nos. 159 and 161)<br><br>14 Day Deadline for Additional Briefing |

22        Defendants Pacific Gas and Electric Company ("PG&E") and IBEW Local 1245

23  ("IBEW") have filed motions for summary judgment that together challenge the Court's

24  jurisdiction to proceed on Plaintiffs' Becky Greer, Timothy C. Budnik, Rosario Saenz, Ian Carty,

25  Haley Markwith, and Maria Garcia Pesina, individually and as "Class Representatives,"

26  ("Plaintiffs") claims.

27        Plaintiffs' complaint alleges that PG&E failed to pay wages due under the collective

28  bargaining agreement because PG&E failed to give them credit for their "directly related clerical

job experience." Plaintiffs assert breach of contract claims as well as various related labor code violations and similar claims. Defendants generally challenge the Court's ability to proceed on these claims on the basis that they have already been finally resolved between PG&E and the union, IBEW, as part of the dispute resolution process provided in the governing collective bargaining agreement. PG&E raised this challenge at the motion to dismiss stage, but the Court allowed the claims to proceed based on factual allegations in the complaint about the lack of finality of PG&E and IBEW's resolution and breach of IBEW's duty of fair representation. Defendants raise their jurisdictional defense again in the context of their motions for summary judgment based on a developed factual record.

The Court will grant Defendants' motion in part and deny in part as it related to the causes of action One and Eight in the Third Amended Complaint, which concern the breach of contract claim and breach of the duty of fair representation claim. As explained more below, the Court agrees with Defendants that Plaintiffs are precluded under the law from challenging the contractual interpretation of "directly related clerical job experience" that resulted from the resolution of Grievance 21052. The resolution regarding contractual interpretation, as reflected in Pre-Review Committee Number 21052 letter of November 24, 2013, was a final and binding decision under the CBA. It resulted from a properly filed grievance and proceeded through the first four steps of the grievance process. It properly addressed an ambiguity in the CBA regarding the meaning of "directly related clerical job experience," and does not clearly contradict the terms of the CBA. While the Court understands Plaintiffs' arguments regarding why the interpretation that resulted from that process too narrowly defined applicable experience, the Court must defer to the result of the CBA grievance process under the law. Moreover, the Union did not breach its duty of fair representation because the Union properly investigated the issue, proceeded through the grievance process, and used its judgment. Although it did not confer with individual employees before agreeing to the resolution, the employees did not have any unique relevant information and the Union was not legally obligated to solicit their opinions on an issue of CBA contractual interpretation.

The same cannot be said of the individual determinations as to which employees qualified for a higher rate of pay under the CBA, which followed from the Grievance 21052 resolution. When it came to who was entitled to the wage increase, the Union (and PG&E) completely side-stepped the grievance process. Instead, they agreed on a list of qualifying employees informally between themselves and then prohibited any employees from filing a grievance challenging that decision. Under the terms of the CBA, such a decision is not treated as final and binding. Moreover, Plaintiffs have raised disputes of fact regarding whether the Union engaged in an adequate investigation to make such determination. They agreed to look only at resumes submitted at the time of application, without the knowledge of the relevant criteria, even though documents indicate the Union itself conceded that the resumes were not sufficiently detailed to conduct the evaluation required by the CBA and Grievance 21052 guidance. Moreover, the Union never sought any employee input, even though the employees would have relevant information about their background to help determine whether they possessed relevant experience. The Union agreed to further limit qualifying experience based on criteria outside, and arguably contradicting, the CBA and Grievance 21052 guidance. Accordingly, the Court will deny Defendants' motions to the extent they seek to preclude Plaintiffs from challenging their entitlement to the wage increase under the terms of the CBA as interpreted by the Pre-Review Committee Number 21052 resolution letter.

As to the remaining arguments raised in the summary judgment motions, the Court seeks supplemental briefing regarding whether and to what extent the parties believe summary judgment as to other causes of action is appropriate consistent with this decision.

## I. PROCEDURAL BACKGROUND

On July 10, 2015, Plaintiffs Becky Greer, Timothy C. Budnik, Rosario Saenz and Ian Carty, as individuals and on behalf of themselves and all others similarly situated, filed suit against PG&E alleging various claims based on underpayment of wages for a purported class. (ECF No. 1). Named Plaintiffs and the purported class members were hired by PG&E as "Customer Service Representative I's." The complaint alleged that PG&E's job postings for Customer Service Representative I advertised an entry level hourly wage of $23.88 per hour.

Plaintiffs' complaint also alleged that Plaintiffs and Proposed Class all had previous experience ranging from at least six (6) months of customer service experience to greater than two (2) years experience. When hired, however, Plaintiffs were told that they would have a starting pay rate of $18.76 per hour. However, their base salary may be increased as detailed in the "International Brotherhood of Electrical Workers (IBEW) Collective Bargaining Agreement" ("CBE"). That agreement provided for elevated rates of pay based on more than 6 months of prior "directly related clerical job experience." Plaintiffs alleged various causes of action claiming that they did not receive wages commensurate with their amount of "directly related clerical job experience."

A First Amended Complaint ("1AC") was filed on August 28, 2015 alleging eleven causes of action against PG&E. (ECF No. 11). IBEW was not named as defendant in the original complaint or the 1AC.

PG&E moved to dismiss all eleven claims against it on September 25, 2015 on the basis that they were preempted by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a) ("§ 301"), Plaintiffs had failed to allege that IBEW breached its duty of fair representation, and even if they had, the Section 301 claims would be time-barred. (ECF No. 13). PG&E argued: "Plaintiffs concede that *this very dispute* was grieved and resolved by the IBEW under the CBA's grievance procedures, but assert that they were treated incorrectly by the collectively bargained settlement." (ECF No. 13, p. 3) (internal citations omitted). PG&E argued as a matter of law: "Before bringing a suit governed by Section 301, an individual plaintiff is first required to exhaust the grievance and arbitration remedies provided in the CBA. *DelCostello,* 462 U.S. at 163; *Republic Steel Corp. v.* Maddox*,* 379 U.S. 650 (1965). 'Subject to very limited judicial review, [the employee] will be bound by the result according to the finality provisions of the agreement[,]' unless he or she can show the union has breached its duty of fair representation. *DelCostello,* 462 U.S. at 164; *accord Vaca v. Sipes,* 386 U.S. 171, 185-86 (1967)." (ECF No. 13, p. 7).

On December 28, 2015, the Court issued an order granting, in part, and denying, in part, PG&E's motion to dismiss the 1AC. (ECF No. 31). The Court explained in relevant part:

Defendant's motion to dismiss first argues that the case should be dismissed because Plaintiffs failed to allege that the Union breached its duty of fair representation. Defendant claims "[a]bsent this necessary element, Plaintiffs" claims under Section 301 must be dismissed because the FAC fails to state a claim for which relief can be granted." (Motion to Dismiss 1:14-15, ECF No. 13.). This is an incorrect statement of the law because it glosses over the underlying question of whether the grievance procedure used here was intended to be final without judicial review.

Defendant relies on *DelCostello v. International Brotherhood of Teamsters et al.*, 462 U.S. 151 (1983), but the Court in that case rested its decision on the fact that Plaintiff was challenging the results of a grievance process that resulted in an individual hearing, which, "[u]nder the collective bargaining agreement . . . [was] final and binding on all parties." *Id.* at 155 and 164 ("Subject to very limited judicial review, [the plaintiff] will be bound by the result according to the finality provisions of the agreement"); *see also Dickeson v. DAW Forest Prods. Co.*, 827 F.2d 627, 629 (9th Cir. 1987) ("If an employee pursues a grievance procedure under a collective bargaining agreement that the parties intended to be final, and receives an adverse determination, he may not challenge that determination under section 301 unless he shows that the union breached its duty of fair representation or that the procedure was otherwise infected"). In contrast, where the collective bargaining agreement does not provide for a binding grievance process, plaintiffs can file suit without alleging a breach of a union's duty of fair representation. *See, e.g.*, *Lerwill v. Inflight Motion Pictures*, 582 F.2d 507, 511 (9th Cir. 1978) ("The collective bargaining agreement in question did not provide for specific grievance procedures, and therefore there was nothing to exhaust before recourse could be had to the courts"). Thus, a gating issue to decide whether Plaintiffs may seek relief in this Court is whether the grievance process was meant to be final without judicial oversight.

(ECF No. 31, pp. 8-9). Second, the Court explained:

Even if the finality provisions of the CBA rendered the grievance proceedings final and binding, however, Plaintiffs are still be able to bring suit in federal court if they allege that the Union breached its duty of fair representation. *DelCostello*, 462 U.S. at 164 ("In *Vaca* and *Hines*, however, we recognized that this rule works an unacceptable injustice when the union representing the employee in the grievance/arbitration procedure acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation. In such an instance, an employee may bring suit against both the employer and the union, notwithstanding the outcome or finality of the grievance or arbitration proceeding").

(ECF No. 31, p. 11).[1]

---

[1] The Court also held that Plaintiffs' claims were not barred by the statute of limitations. (ECF No. 31, p. 17). The Court then addressed the preemption issue, dismissed certain claims, and gave leave to amend.

On November 2, 2016, Plaintiffs filed a Third Amended Complaint ("3AC"), which is the operative complaint and subject of the current motions for summary judgment. (ECF No. 105). The 3AC consisted of seven causes of action against PG&E, and one claim against IBEW. (*Id.*) Of particular relevance to this order are the First and Eighth Causes of action. The First Cause of Action asserts a claim for Breach of Contract against Defendant PG&E for (1) developing an artificially narrow interpretation of "directly related clerical job experience"; and (2) failing to pay employees with such experience wages due. (ECF No. 105, pp. 35-36) ("Defendant PG&E breached the CBA by developing an artificially narrow interpretation of 'directly related clerical experience' in order to limit the number of settlement payouts it would be required to issue. . . . Defendant PG&E breached the CBA, PRC 21502, ant the Labor Code by failing to provide Plaintiffs with all the wages they were due based on their 'directly related clerical job experience.'").

The Eighth Cause of Action pleads an "alternative" claim for Breach of the Duty of Fair Representation, 29 U.S.C. § 185, against IBEW as follows:

> In the event it is determined that the resolution of the grievance procedure precludes judicial review, Plaintiffs plead this cause of action in the alternative as a 'hybrid' claim.

> A labor union has a duty under the law to represent fairly the interests of its members in protecting their rights under a collective bargaining agreement. . . . Plaintiffs and the Proposed Class are members of, and represented by, Defendant IBEW. Defendant IBEW breached its duty of fair representation to Plaintiffs and the Proposed Class by engaging in conduct that was arbitrary, discriminatory, and/or in bad faith.

(ECF No. 105, pp. 47-48). The complaint then lists various allegations of arbitrary, discriminatory and/or bad faith conduct in related to the resolution of Grievance 21502 and subsequent settlement of wages with PG&E.

On May 12, 2017, IBEW and PG&E filed separate motions for summary judgment. (ECF Nos. 159, 161). IBEW's motion seeks judgment in its favor on the Eighth Cause of Action against it and holding that IBEW did not violate its Duty of Fair Representation as a matter of undisputed facts. In the alternative, it seeks an order granting partial summary judgment that

IBEW did not violate its Duty of Fair Representation regarding specific actions it took in relation to this issue, including:

> 1. Resolving the contract interpretation issue at the heart of Grievance 21052 by negotiating and agreeing with PG&E in PRC 21052 to a clarification of the contract term "directly related clerical job experience" ("DRJCE") as that phrase applies to Service Representative I ("SR I") employees employed at PG&E Call Centers, for purposes of determining whether a Call Center SR I would be entitled to be paid at the 18-month SR I wage rate as the SR I's starting wage rate (referred to as an "Exh. A wage adjustment");

> 2. Agreeing informally with PG&E to waive the contractual grievance procedure timeliness in process Grievance 21052, to allow the parties sufficient time to investigate and negotiate resolution of the grievance;

> 3. Agreeing with PG&E not to credit prior sales experience as experience constituting DRCJE;

> 4. Agreeing with PG&E not to credit experience accrued more than 5 years before an SR I's date of hire as experience constituting DRCJE;

> 5. Agreeing with PG&E to provide the Exh. A wage adjustment at the SR I 18-month wage rate for Call Center SR Is with qualifying DRCJE for any amount of such prior experience of 18-months or more;

> 6. Agreeing with PG&E, after learning that other job applications were not available, to review only resumes submitted by SR I's when applying for the SR I Call Center job as the basis for determining whether an SR I had qualifying DRCJE;

> 7. Adequately investigating the issues presented by Grievance 21052, and the implementation of its resolution in PRC 21052;

> 8. Determining not to move Grievance 20152 to arbitration, either regarding the interpretation of DRCJE as it applies to Call Center SR Is, or regarding the implementation of PRC 21052;

> 9. Refusing to file additional grievances seeking Exh. A wage adjustments on behalf of SR Is who were unhappy about not being provided an Exh. A wage adjustment;

> 10. Making any decision or taking any other action raised by Plaintiffs in opposition to IBEW's motion for summary judgment.

(ECF No. 159). PG&E's motion then asks for dismissal of claims asserting PG&E breached its contract and violated various labor code provisions on the basis that the grievance resolution procedure was final and binding, and IBEW did not violate its duty of fair representation. (ECF No. 161)

The Court heard oral argument on these motions on July 21, 2017, and took the matter under submission. (ECF No. 177, 182).

## II.     MATERIAL FACTS RELEVANT TO SUMMARY JUDGMENT[2]

In 2010, Defendant PG&E's customer service call volume was increasing as a result of changing market conditions, such as the introduction of the PG&E "smart meter" program. In response to the increasing call volume, PG&E investigated expansion of its labor force by hiring additional customer service personnel in its five call centers. PG&E also has local offices throughout California where service representatives provide "in person" customer service.

In 2010, Defendants IBEW and PG&E negotiated a Collective Bargaining Agreement ("CBA") applying to PG&E's office and clerical employees, effective January 1, 2011 to December 31, 2014.[3] (JSUF 4). In the 2011 CBA, IBEW and PG&E created two new job classifications, Service Representative-I ("SR-I") and Service Representative-II. (JSUF 9; DSUF 1). The SR-I job is an entry-level "beginner classification" position. (JSUF 10). As negotiated by IBEW and PG&E, SR-Is were to have lower pay rates than existing PG&E service representatives.

The CBA provides for SR-I wage rates, wage progressions commensurate with tenure and/or experience in each classification, and "cost of living" adjustments of 2% a year. (JSUF 11). Exhibit A to the CBA contains a section entitled "Clerical Hiring Rate Guidelines" (the "Guidelines"), which provide for a higher starting wage for new SR-Is that have prior "directly related clerical job experience," as follows:

CLERICAL HIRING RATE GUIDELINES

The following hiring rate guidelines apply to clerical employees hired under the Agreement:

1.) An employee with less than 6 months of directly related clerical job experience will be hired at the starting rate of the applicable clerical classification.

---

[2] On summary judgment, the Court considers the facts in a light most favorable to the nonmoving party. As used herein, "JSUF" means Joint Statement of Undisputed Facts (ECF No. 159-2) and "DSUF" means Defendant IBEW's Statement of Undisputed Facts (ECF Nos. 159-3; 171-1).
[3] PG&E and IBEW agreed to extend the terms of the 2011 CBA for one year, effective January 1, 2015 to December 31, 2015. (JSUF 4).

8

An employee with 6 months, but less than 12 months directly related clerical job experience, will be hired at the 6-month rate of the applicable clerical classification.

An employee with 12 to 18 months directly related clerical job experience, will be hired at the one-year rate of the applicable clerical classification.

An employee with 18 to 24 months directly related clerical job experience, shall be hired at the 18-month rate of the applicable clerical classification.

An employee, other than Utility Clerk, with 2 years or more directly related clerical job experience, shall be hired at the 24-month rate of the applicable clerical classification.

A Utility Clerk with 24 to 30 months directly related clerical job experience, shall be hired at the 24-month rate of the Utility Clerk.

A Utility Clerk with 30 months directly related clerical job experience, shall be hired at the 30-month rate of the Utility Clerk.

2.) In applying paragraph 1, credit will be given for office clerical work, "office clerical work" does not include: (a) sales work in any type of retail establishments; (b) work as a teller in a bank or savings institution.

3.) Credit for work experience will not be given for jobs held prior to a five-year break in employment.

4.) No credit will be given for non-verifiable work experience.

5.) No credit will be given for summer or part-time work experience accrued while a student.

6.) Credit will not be given for experience accrued on a casual or intermittent basis, including work performed while employed through a temporary agency.

(ECF No. 156-6, p. 192).

From January, 2011 to June 2015, over 900 employees were hired by PG&E into the SR-I classification, including the proposed class and class representatives. Candidates for the SR-I went through a rigorous interview and evaluation process with PG&E in order to hire the most qualified applicants. Fewer than 2% of applicants were hired. Numerous documents rating the qualification of individuals, as well as verification of past employment, were generated in this process.

Contrary to the 2010 negotiations, the CBA terms, and decades of past practice, PG&E unilaterally determined that all new hires into the SR-I classification would only have "directly related clerical job experience" pursuant to the Guidelines if they had 18 or more months of experience *at PG&E* accrued within 12 months of the hire date. This policy resulted in SR-Is

without prior PG&E experience being hired at the lowest pay step and was applied to every SR-I

hired between January, 2011 and June, 2015.

IBEW filed a Grievance to contest PG&E's narrow interpretation of the CBA and failure

to pay qualifying SR-Is the wages due.  Grievance No. 21052 was filed on June 10, 2011 by

grievant "IBEW Local Union 1245." (ECF No. 169-6, p. 261).  The specific issue grieved is as

follows:

> Some new employees who have completed, and are currently enrolled in the 2011
> CSR classes at the PG&E Call Centers (Sacramento), have questioned their
> starting rate of pay of $18 because of Exhibit A – Clerical Hiring Rate Guidelines..
> When questioned by the Union, Company has never given the Union a direct
> answer on whether or not any of these employees have been placed at a higher
> starting rate of pay per Exhibit A.  Employees are still questioning what their rate
> of pay is and are not being told anything until they assume their bidded shift.  This
> issue was first-stepped by Union Business Rep and Sac CC IR Rep on 6/10/11.
> Union contends this is a willful violation of the Clerical bargaining agreement,
> since many of these employees have prior "directly related clerical job experience"
> per Exhibit A, yet the Company seems to be ignoring any past clerical experience
> and denying these employees their proper rate of pay.

(*Id.*)

On August 2, 2011, PG&E representative Chris Diamond formally responded to

Grievance 21052 as follows:

> Employee's (sic) do not meet requirements under Exhibit A to qualify for a higher
> starting wage resulting from credit of past work experience under the hiring
> guidelines for "directly related clerical job experience."  There is no violation.
> Request by union is respectfully denied.

(*Id.*)

Pursuant to Step Two of the formal grievance process, the Local Investigating Committee

("LIC") had a meeting addressing Grievance No. 21052 on or about September 12, 2011. (JSUF

15).  The LIC then issued a Joint Statement of Facts on November 15, 2011 and referred

Grievance No. 21052 to the Fact Finding Committee the same day, which is the third step in the

grievance procedure.  (JSUF 15; ECF No. 169-7, pp. 377-380).  The facts of the case concerned

"the criteria used for determining starting wages based on existing Exhibit A language."  (ECF

No. 169-7, p. 377).  Notably, nothing in the Statement of Facts concerned any specific employee or their specific prior experience. (ECF No. 169-7, pp. 377-382).

Also pursuant to the CBA grievance process, the Fact Finding Committee issued a report and referred Grievance No. 21052 to the Pre-Review Committee ("PRC") on August 21, 2012. (JSUF 16; ECF No. 169-7, p. 384).  The PRC is the fourth step in the grievance procedure. (JSUF 7).  The Referral to the Pre-Review Committee summarized the issue as follows: "Disagreement between the parties has arisen over the criteria utilized for determining starting wages for new hires and transferring employees based on established Exhibit A language."  (ECF No. 169-7, p. 384).

The two members of the PRC, Ed Dwyer, Jr. (IBEW) and Doug Veader (PG&E) met to discuss Grievance No. 21052 on several occasions between August 2012 and November 2013. These discussions were focused on the meaning of the term "directly related clerical job experience" in Exhibit A to the CBA.

Grievance 21052 was formally resolved under the Grievance process by a determination of the PRC at step four in the process.  Specifically, on November 24, 2013, the PRC issued a letter providing guidance on the meaning of "directly related clerical job experience" and resolving Grievance No. 21052.  (ECF No. 169-6, pp. 263-65)  It concluded:

> The Committee agrees that the definition which was being used at the time of this grievance did not comply with the Hiring Guidelines. Limiting credit to PG&E Contact Center experience within the past 12 months is more restrictive than the agreed to language in Exhibit A. The Guidelines were never intended to limit prior experience to only prior PG&E experience. Also, the Guidelines specify that credit will not be given for jobs held prior to a five year break, and do not limit credit for work within the past 12 months.

> While Exhibit A does provide some guidance, it does not clearly define what constitutes "directly related clerical job experience". The intent of the language is to provide higher initial wage placement for individuals who bring directly related experience and knowledge which allows them to perform at a more experienced (and higher paid) level of work. Once in the classification, further progressive wage increases would be based accumulated time as provided for in Section 13.7.

> During the processing of this grievance, the Call Center management revised its criteria of directly related clerical experience to include: "Customer service work in a call center environment where the nature of the work and complexity of the

11

billing, systems, and rules is comparable to that at a PG&E Contact Center. Such work experience would need to include identifying and resolving customer inquiries on all phases of customer service (i.e.: service billing and credit)".

The Committee agrees that the revised application complies with the Hiring Guidelines and the intent as described above. The Committee noted that the last sentence comes directly from the Company/Union negotiated Benchmark Duty Statement 5066. Employees who are hired into the Service Representative I classification with 18 months or more of verifiable work experience as defined above should be placed at the 18 month rate step.

As guidance in the application of the Exhibit A Hiring Rate Guidelines, the Committee discussed examples of job experience which would or would not be considered as directly related. The Committee did not include examples of job experiences which are specifically excluded from consideration under the guidelines (e.g. non-clerical, retail sales, and banking). The examples assume at least 18 months of the verifiable work experience, which did not precede a five-year break in employment, and are not intended to be all inclusive

- AT&T Call Center Customer Service Representative responsible for answering customer requests or inquiries concerning services, products, billing, and usage. Explaining customer's bill and recommending rate plans based on customer's usage, and establishing payment arrangements within established guidelines.

- Comcast Call Center Customer Service Representative responsible for answering customer requests or inquiries concerning services, products, billing, and usage. Explaining customer's bill and recommending rate plans based on customer's usage, and establishing payment arrangements within established guidelines.

The above examples are considered as directly related as the nature and extent of the work and complexity of the billing, systems, and rules are comparable to that at a PG&E Contact Center.

- AAA Customer Services Representative responsible for answering customer questions regarding member services, such as maps and discounts, and dispatching tow trucks.

- Comcast Customer Account Executive responsible for promoting, recommending, and selling products and services based on customers' needs and interests, (sic)

The above examples are not considered as directly related as the nature and extent of the work and/or complexity of the billing, systems, and rules are not comparable to that at a PG&E Contact Center.

Decision

> This grievance is closed based on the above discussion and understanding. Any disputes as to 'related job experience' are remanded to the Local Investigating Committee for resolution. The Pre-Review Committee retains jurisdiction over any disputed adjustments.

(ECF No. 169-6, pp. 263-65). The letter listed Chris Diamond (PG&E) and Arlene Edwards (IBEW) as members of the LIC. (*Id.*)

Following November 24, 2013 letter, PG&E and IBEW decided between themselves which of employees should receive the higher rates of pay. They looked only to the resumes submitted in connection with hire. Neither PG&E nor IBEW informed employees of the PRC's criteria and or solicit any input from employees regarding their past qualifying experience. In fact, the Union agreed not to consider any input from employees. Furthermore, IBEW did not refer disputes to the LIC, as directed in the PRC letter. On the contrary, IBEW forbade any employee from submitting a grievance regarding his or her rate of pay.

Moreover, during their review, PG&E and IBEW agreed to some further limitations to qualifying employees beyond the criteria identified in the resolution letter, including not crediting any experience accruing more than 5 years before an SRI's date of hire and not crediting any prior sales experience. (ECF No. 159, p. 3).

Also throughout this process, IBEW was unaware that PG&E possessed additional data concerning the SR-Is qualifications and prior work history. IBEW asked PG&E during the resume review process whether any writing or electronic data existed to determine past work experience. PG&E misrepresented that such documents or data were "no longer available, that they had been destroyed." (ECF No. 169-3, p. 1490).

As a result of this resume review process, in December 2014, 49 individual SR-I employees were given retroactive and prospective wage adjustments. (JSUF 17). On December 15, 2014, IBEW Senior Director for Customer Service Scott Sanford sent an email to inform its customer service members that it had concluded its review and determined which employees were entitled to a wage adjustment. (ECF No. 169-6, pp. 64-65). Notably, no reasons were given as to why any employee was included or excluded from the list. In fact, no reasoning was ever provided to any employee why any employee failed to qualify for the wage increase.

After IBEW received objections and protests from its members, another resume review was undertaken by IBEW and PG&E. They used the same process as they had before, reviewing only initially-submitted resumes and refusing to consider any additional submission from SR-Is.

On April 28, 2015, IBEW filed Grievance No. 23159. (JSUF 18). The grievance was filed on behalf all affected SR-Is and complained that PG&E "has disparately applied the Pre Review Committee case 21052 decision to its employees hired into the Call Center Operations starting on or about 12/15/2014." (ECF No. 159-2, p. 155). PG&E responded two days later on April 30, 2015 indicating the issue raised has been resolved by a "Compromise and Release Agreement." This issue did not proceed to a Local Investigating Committee, Fact Finding Committee, or Review Committee, not to mention Arbitration.

On April 30, 2015, Scott Sanford (IBEW) sent an email to members with the subject "Exhibit A – Rate of Pay Settlement Follow Up," concluding:

> Those individuals will receive a direct communication from me no later than Saturday, May 2nd informing them of their qualification for receiving a settlement payout. Only those employees who will be receiving the payout will receive the follow up email and with the completion of this additional review.

> In all though, the decisions made by the union and company are final.

(ECF No. 169-6, pp. 269-270).

On May 1, 2015, IBEW and PG&E executed a Compromise and Settlement Agreement. (JSUF 19, ECF No. 159-2, pp. 157-160). This settlement concerned "the implementation of Pre-Review Committee ("PRC") Decision 21502 and Business Manager Grievance 23159." It included stipulations including:

> PG&E believes that the parties have collectively followed and implemented PRC Decision 21502 and that Business Manager Grievance 23159 related to the implementation is not a proper subject for the grievance process. . . .

> The parties agree that the payments described herein that shall be made by PG&E to current employees identified in the attached Exhibit to this Agreement shall constitute payment in full and final settlement of all grievance and claims for damages made and threatened by Local 1245, including Business Manager Grievance 23159, against PG&E regarding the implementation of PRC Decision 21052. . . .

1  (ECF No. 159-2, pp. 157-160).  As part of the agreement, PG&E agreed to make additional

2  payments to certain identified employees.  On May 22, 2015, 88 additional SR-I employees

3  received retroactive and prospective wage adjustments. (JSUF 20).

4  **III.     LEGAL STANDARDS**

5           **A. Motion for Summary Judgment**

6           Summary judgment is appropriate when, viewing the evidence in the light most favorable

7  to the nonmoving party, "the movant shows that there is no genuine dispute as to any material

8  fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Zetwick v.*

9  *Cty. of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017) (quoting *United States v. JP Morgan Chase Bank*

10 *Account No. Ending 8215*, 835 F.3d 1159, 1162 (9th Cir. 2016)).  "Once the moving party meets

11 its initial burden, the non-moving party must 'go beyond the pleadings and by her own affidavits,

12 or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific

13 facts showing that there is a genuine issue for trial.'" *Burch v. Regents of Univ. of Cal.*, 433

14 F.Supp.2d 1110, 1125 (E.D. Cal. 2006) (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 324

15 (1986)).

16         "[A]t the summary judgment stage the judge's function is not himself to weigh the

17 evidence and determine the truth of the matter but to determine whether there is a genuine issue

18 for trial." *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511.  "Courts may not resolve genuine

19 disputes of fact in favor of the party seeking summary judgment" or make credibility any

20 determinations. *Zetwick*, 850 F.3d at 441 (citing *Tolan v. Cotton*, --- U.S. ---, 134 S. Ct. 1861,

21 1866, 188 L. Ed. 2d 895 (2014); *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Reeves v. Sanderson*

22 *Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

23         Rule 56 does not require that the absence of any factual dispute. *See Hanon v.*

24 *Dataproducts Corp.*, 976 F.2d 497, 500 (9th Cir. 1992).  Rather, there must be no *genuine* issue

25 of *material* fact. *Id*. (emphasis as in original) (quoting *Anderson v. Liberty Lobby, In*c., 477 U.S.

26 242, 248, 106 S.Ct. 2505, 2510 (1986)).  "In short, what is required to defeat summary judgment

27 is simply evidence 'such that a reasonable juror drawing all inferences in favor of the respondent

28 could return a verdict in the respondent's favor.'" *Zetwick*, 850 F.3d at 441 (quoting *Reza v.*

*Pearce*, 806 F.3d 497, 505 (9th Cir. 2015); *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505). "On the other hand, the Supreme Court has made clear: 'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and summary judgment is appropriate.'" *Id.* (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

## B. Breach of a Collective Bargaining Agreement

The Supreme Court in *DelCostello v. International Broth. of Teamsters*, 462 U.S. 151 (1983) explained when a Court can hear a claim for breach of a collective bargaining agreement as follows:

> It has long been established that an individual employee may bring suit against his employer for breach of a collective bargaining agreement. *Smith v. Evening News Assn.,* 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962). Ordinarily, however, an employee is required to attempt to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement. *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965); *cf. Clayton v. Automobile Workers,* 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981) (exhaustion of intra-union remedies not always required). Subject to very limited judicial review, he will be bound by the result according to the finality provisions of the agreement. *See W.R. Grace & Co. v. Local 759*, —— U.S. ——, at ——, 103 S.Ct. ——, at ——, 75 L.Ed.2d ——; *Steelworkers v. Enterprise Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). In *Vaca* and *Hines,* however, we recognized that this rule works an unacceptable injustice when the union representing the employee in the grievance/arbitration procedure acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation. In such an instance, an employee may bring suit against both the employer and the union, notwithstanding the outcome or finality of the grievance or arbitration proceeding. *Vaca,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842; *Hines,* 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231; *Mitchell,* 451 U.S. 56, 101 S.Ct. 1559, 67 L.Ed.2d 732; *Bowen,* 459 U.S. 212, 103 S.Ct. 588, 74 L.Ed.2d 402; *Czosek v. O'Mara,* 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970).

*DelCostello*, 462 U.S. at 163–64. *See also Dickeson v. DAW Forest Products Co.,* 827 F.2d 627, 629 (9th Cir. 1987) ("If an employee pursues a grievance procedure under a collective bargaining agreement that the parties intended to be final, and receives an adverse determination, he may not challenge that *determination* under section 301 unless he shows that the union breached its duty

of fair representation, *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), or that the procedure was otherwise infected.").

Where a breach of a CBA is alleged, a Plaintiff may generally bring one of two types of claims. *See id.* First, a plaintiff may bring a "straightforward" § 301 claim, which alleges a breach of the CBA against the employer without accompanying allegations that a union breached its duty of fair representation. *Id.* (distinguishing between a "straightforward breach of contract suit under § 301" and a "hybrid § 301/fair representation claim"). A straightforward § 301 claim is brought "directly" against an employer and involves the employee's "uniquely personal rights" including "wages, hours, Overtime pay, and wrongful discharge." *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 511 (9th Cir. 1978) (citing *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. at 562, 96 S.Ct. at 1055).

With respect to a straightforward § 301 a claim, "an employee is required to attempt to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement…" and "[s]ubject to very limited judicial review, he will be bound by the result according to the finality provisions of the agreement." *DelCostello*, 462 U.S. at 163-64, 103 S. Ct. at 2290-91. However, exceptions exist to this general requirement. A plaintiff can file a straightforward section 301 claim against the employer alleging breach of the CBA (without alleging a breach of a union's duty of fair representation) where the collective bargaining agreement does not provide for a binding grievance process. *See, e.g., Lerwill*, 582 F.2d at 511 ("The collective bargaining agreement in question did not provide for specific grievance procedures, and therefore there was nothing to exhaust before recourse could be had to the courts"); *Dickeson,* 827 F.2d at 629–30 ("In a case such as this when the contract is silent as to whether the grievance procedure is final and the only remedy is to strike, we are very hesitant to conclude that the parties intended that the procedure be final. . . . Prohibiting access to the courts bypasses an opportunity to use reason in favor of "economic warfare." . . . Accordingly, we conclude that the grievance procedure was not intended to be final. Having exhausted the administrative process, Dickeson may bring suit against DAW under section 301."). Additionally, employees can obtain judicial review of their straightforward section 301 claim without first exhausting the remedies under the CBA when the

employer's actions effectively repudiated the grievance procedures of the CBA. *See Vaca*, 386 U.S. at 185, 87 S.Ct. 903.

Additionally, plaintiffs may bring a lawsuit alleging breach of a CBA, irrespective of a final and binding dispute resolution process in the CBA, if they also allege that the Union breached its duty of fair representation. *DelCostello*, 462 U.S. at 164 ("In *Vaca* and *Hines*, however, we recognized that this rule works an unacceptable injustice when the union representing the employee in the grievance/arbitration procedure acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation. In such an instance, an employee may bring suit against both the employer and the union, notwithstanding the outcome or finality of the grievance or arbitration proceeding"). This type of claim is referred to as a "hybrid" section 301 claim. *Id*. at 165 ("The employee may, if he chooses, sue one defendant and not the other; but the case he must prove is the same whether he sues one, the other, or both. The suit is thus not a straightforward breach of contract suit under § 301, as was *Hoosier*, but a hybrid § 301/fair representation claim"). Such allegations need not form a separate cause of action, nor do they necessarily need to be directed towards the union as a separate defendant. *Id*.

Unlike a straightforward section 301 claim, judicial review of a hybrid section 301 claim is not precluded when an employee fails to exhaust the dispute resolution process in the CBA. *See Soremekun v. Thrifty Payless, Inc*., 509 F.3d 978, 986 (9th Cir. 2007) (explaining that "in the ordinary case, an employee's failure to exhaust contractually mandated procedures precludes judicial relief for breach of the collective bargaining agreement and related claims" but "[a]n exception to the general requirement of exhaustion exists, however, where the employee demonstrates that 'the union representing the employee in the grievance/arbitration procedure [has acted] in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation…'").

"A union's duty of fair representation grows from its statutory right to exclusive representation." *Demetris v. Transp. Workers Union of Am., AFL-CIO*, 862 F.3d 799, 804 (9th Cir. 2017). "Because a union has exclusive statutory authority to represent its members, it has a

corresponding legal obligation 'to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.'" *Id.* (quoting *Vaca*, 386 U.S. at 177, 87 S.Ct. 903, 17 L.Ed.2d 842). "In its role as the employees' exclusive representative, the Union must be careful to protect the interest of all those whom it represents." *Tenorio v. N.L.R.B.*, 680 F.2d 598, 602 (9th Cir. 1982) (citing *Vaca*, 386 U.S. at 177, 87 S.Ct. at 909; *Ford Motor Co. v. Huffman*, 345 U.S. 330, 337-38, 73 S.Ct. 681, 685-686, 97 L.Ed. 1048 (1953)).

"Unions have broad discretion to act in what they perceive to be their members' best interests." *Moore v. Bechtel Power Corp.*, 840 F.2d 634, 636 (9th Cir. 1988) (citing *Ford*, 345 U.S. at 337-39). However, the union may breach its duty of fair representation to its members "when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith." *Demetris*, 862 F.3d at 805 (quoting *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 44, 119 S.Ct. 292, 142 L.Ed.2d 242 (1998). Plaintiffs bear the burden of proving that a union breached such duty. *Id.* (citing *Beck v. United Food & Commercial Workers Union*, 506 F.3d 874, 879 (9th Cir. 2007)). "[A] union's conduct generally is not arbitrary when the union exercises its judgment." *Id.* (citing *Beck*, 506 F.3d at 879; *Peterson v. Kennedy*, 771 F.2d 1244, 1254 (9th Cir. 1985)).

## IV.    ANALYSIS

The Court now turns to evaluating which if any part of Plaintiffs' Breach of Contract claim can proceed in this Court in light of the underlying agreements between PG&E and the Union, IBEW.  IBEW's motion urges the Court to analyze the underlying process in terms of "two basic phases:

> "The first phase was the negotiated agreement between IBEW and PG&E in PRC 21052 to resolve the contract interpretation dispute that caused IBEW to file the grievance.  PRC 21052 is a final and binding resolution of the Grievance.  As such, it is itself a collective bargaining agreement clarifying the meaning of the ambiguous DRCJE phrase in the CBA as it applies to Call Center SR Is.  . . . The second phase of Grievance 21052 was the implementation of PRC 21052, to determine which of more than 900 SR1s is within the scope of the grievance did

nor did not have sufficient DRCJE, as clarified, to qualify for an Exh. A wage adjustment."[4]

(ECF No. 159-1, p. 18). Although Plaintiffs attempt to group these two phases together, the Court agrees that each phase deserves separate treatment because their differing circumstances are relevant under the legal principles at issue.

### A. Grievance 21502

Again, Plaintiffs claim that PG&E breached the CBA by developing an artificially narrow interpretation of "directly related clerical job experience." (ECF No. 105, p. 35 ("Defendant PG&E breached the CBA by developing an artificially narrow interpretation of 'directly related clerical experience' in order to limit the number of settlement payouts it would be required to issue.")). As described above, this issue was the subject of Grievance 21052. That grievance went through four steps in the CBA's conflict resolution process, including submission of the grievance to the Local Investigating Committee (ECF No. 169-7, pp. 377-381), referral to Pre-Review Committee (ECF No. 169-7, p. 384), and written decision from the Pre-Review Committee (ECF No. 169-6, pp. 263-277).

Under the terms of the CBA, this resolution was final and binding. The Pre-Review Committee is part of Step Four of the Grievance Procedure. (ECF No. 159-2, p. 28). Under the finality provisions of the CBA, "[t]he resolution of a timely grievance at any of the steps provided herein shall be final and binding on the Company, Union and the grievant. A resolution at step below Step *Four*, while final and binding, is without prejudice to the position of either party, unless mutually agreed to otherwise." (ECF No. 159-2, p. 26). While there was some dispute about the meaning of the finality provision regarding a resolution below Step Four at the motion to dismiss, all parties agreed that a resolution at Step Four and above was final and binding. Plaintiffs do not dispute that the resolution of Grievance 21502 was final and binding under the terms of the CBA.

Thus, under the law described above, Plaintiffs may only pursue their claim for breach of contract challenging PG&E's narrow interpretation of the phrase directly related clerical job

---

[4] The Court takes notes that IBEW does not describe the second phase as final and binding under the CBA.

experience by proving that IBEW breached its duty of fair representation in agreeing to that resolution.

Plaintiffs have set forth the following bases as to how IBEW breached their duty of fair representation regarding the 21502 Grievance:

1) IBEW modified the CBA outside of the collective bargaining process;
2) IBEW excluded their members from participation in the grievance process;
3) IBEW failed to comply with the grievance resolution time limits in the CBA; and
4) IBEW failed to pursue arbitration.

The Court will now analyze each of these arguments.

1. *Whether IBEW Breached Its Duty Of Fair Representation by Modifying the CBA Outside of the Collective Bargaining Process*

Plaintiffs assert that any change to the CBA, including the Guidelines, must be negotiated and approved by a vote, and IBEW materially modified the Guidelines when they agreed to restrict the definition of "directly related clerical job experience" in Paragraph 1 the Guidelines to mean "Customer service work in a call center environment where the nature of the work and complexity of the billing, systems, and rules is comparable to that at a PG&E Contact Center. Such work experience would need to include identifying and resolving customer inquiries on all phases of customer service (i.e.: service billing and credit)." IBEW does not agree that it modified the Guidelines. Instead, it argues that the term "directly related clerical job experience" in the Guidelines was ambiguous as to the newly-created SR-I position, and IBEW merely agreed with PG&E to clarify the meaning of the term in order to resolve Grievance No. 21052. Indeed, the CBA explicitly provides that the grievance procedure is appropriate for disputes involving "Interpretation . . . of any of the terms of this Agreement." (ECF No. 159-2, p. 26).

This argument thus turns on the question of whether the resolution of Grievance 21502 constituted additional guidance regarding an ambiguous phrase, or new terms of the contract. As a starting point, the resolution of Grievance 21502 does not purport to modify the CBA—it purports to interpret an ambiguous phrase in the CBA. The PRC resolution letter states: "[w]hile Exhibit A does provide some guidance, it does not clearly define what constitutes 'directly related clerical job experience'" and that the "Committee agrees that the revised application complies

21

with the Hiring Guidelines . . . ." (ECF No. 169-6, pp. 263-65). Thus, the Committee found that the phrase "directly related clerical job experience" was ambiguous and that further guidance was appropriate.

The Court agrees that the phrase "directly related clerical job experience" is ambiguous. "Directly related" is a comparative term with reference to the work of the SR-I. It requires an evaluation of clerical job experience to determine if it is directly related to the work of the SR-I. Moreover, the resolution of Grievance 21052 does not facially contradict the term "directly related clerical job experience." Specifically, the Pre-Review Committee Number 21502 letter adopts the criteria of "directly related clerical experience" to include "Customer service work in a call center environment where the nature of the work and complexity of the billing, systems, and rules is comparable to that at a PG&E Contact Center. Such work experience would need to include identifying and resolving customer inquiries on all phases of customer service (i.e.: service billing and credit." (ECF No. 169-6, p. 264). This interpretation does not facially contradict "directly related clerical job experience," and is appropriately considered an interpretation of that phrase. While the Court understands why Plaintiffs object to limiting such experience to "work in a call center environment," such an interpretation does not contradict any term in the CBA.

In response, Plaintiffs point to the part of the CBA that states "In applying paragraph 1, credit will be given for office clerical work, 'office clerical work' does not include: (a) sales work in any type of retail establishments; (b) work as a teller in a bank or savings institution." (ECF No. 105, p. 104). Plaintiffs argue that this subsection as intended to define "directly related clerical job experience" to include all "office clerical work" as explained in that subsection.

Although an argument can be made that the drafters intended "directly related clerical job experience" to constitute all and only "office clerical work," such a conclusion is not clear and ambiguous from the face of the document. Put another way, Plaintiffs' argument calls into question whether the resolution of the interpretation was correct, but not whether the phrase "directly related clerical job experience" was ambiguous.

Ultimately, the Court finds that the Union did not breach its duty of fair representation in agreeing to the resolution by the Pre-Review committee through the grievance process because that resolution clarified an ambiguous term of the CBA and did not go outside the bounds of the CBA.

> 2. *Whether IBEW Breached Its Duty of Fair Representation by Excluding Their Members from Participation in the Grievance Process*

Section 9.6 of the CBA, which provides that:

**STEP TWO**
**LOCAL INVESTIGATING COMMITTEE**

> …
>
> (2) The Committee shall meet as soon as reasonably possible and shall make a full and complete investigation of all of the factors pertinent to the grievance. If necessary to gain all of the information required to resolve the grievance, the Committee may hold investigative interviews with other persons involved in the dispute. ***Except for good cause to the contrary, the grievant shall be permitted to be present during these interviews***. The grievant will not be a party to the disposition of the grievance, nor is the grievant's concurrence required for the Committee to reach a settlement of the grievance. ***Grievant, however, does have the right to point out the existence of other facts or witnesses favorable to grievant's case***. …

(ECF No. 169-6, p. 128 (emphasis added)).

It is undisputed that no SR-Is were invited to give any comments at any time in the process. They were not invited to provide comments on the interpretation of the CBA or how it affected Plaintiffs. Plaintiffs argue that IBEW's failure to include SR-Is in the process was arbitrary and in bad faith. IBEW asserts that the issue in Grievance No. 21052 was a dispute over the appropriate interpretation of the CBA for which SR-I input was not required.

The Ninth Circuit has held that "a union does not breach its duty of representation by failing to give a grievant notice and an opportunity to attend a grievance hearing where the issue is the proper construction of a collective bargaining agreement." *Evangelista v. Inlandboatmen's Union of Pac.*, 777 F.2d 1390, 1397 (9th Cir. 1985) (collecting cases).

Here, Grievance 21052 related to the proper construction of the CBA. It did not address specific employees or their background. There is no evidence that individual employees had unique knowledge that would have informed the Union in their bargaining.

Accordingly, for this part of the process, the Union did not breach its duty of fair representation by excluding employees who could be affected by the interpretation of the phrase "directly related clerical job experience."

### 3. Whether IBEW Breached Its Duty of Fair Representation by Failing to Comply with the Grievance Resolution Time Limits in the CBA

The CBA contemplates resolution of a grievance within a maximum number of 150 days or, if all extensions are agreed to, within 300 days from the date of filing to submission for arbitration. (CBA § 9.6, ECF No. 169-6, pp. 128-132). Grievance No. 21052 was filed on June 10, 2011, and PRC 21052 was issued on November 24, 2013 (899 days from filing). Plaintiffs argue that IBEW breached its duty of fair representation to its members by unduly delaying resolution of Grievance No. 21052 while IBEW knew that wages were being wrongfully withheld from already-hired SR-Is and additional SR-Is were being hired during the pendency of grievance.

As an example of prejudice, they cite to Plaintiff Markwith and claim that she was underpaid after settlement by approximately $3,656.06. In support of the calculation, Plaintiffs cite to expert report created by Edward T. Garcia, who appears to opine that purported underpayment was a result of delayed advancement through the wage steps in Exhibit F to the CBA. (ECF No. 171-4, pp. 45-46). Without elaboration, Plaintiffs complain that if IBEW had resolved Grievance No. 21052 sooner, Ms. Markwith likely would never have been placed at entry level pay or in need of a wage adjustment.

IBEW argues in response that, given the complexity of the issue, it would have been arbitrary for the parties to abide by the time limits in the CBA. Instead, IBEW informally agreed to extend the timelines in order to give the parties adequate time to investigate and negotiate resolution of Grievance No. 21052.

The Ninth Circuit addressed the issue of timeliness in *Dutrisac v. Caterpillar Tractor Co.*, 749 F.2d 1270 (9th Cir. 1983). In that case, the Ninth Circuit held that the Union had breached its duty of fair representation by failing to file a grievance on time. The Ninth Circuit looked to cases finding that a Union's failure to process a grievance in a timely fashion, which allowed the

deadline to pass without evaluating the merits of the grievance, constitutes a breach of the duty of fair representation. *Id.* at 1273 ("Other courts have found a breach when the union decided to file a grievance but failed to file it in a timely fashion, or negligently allowed the filing deadline to pass without evaluating the merits of the grievance. . . . We conclude that the union should be responsible for a total failure to act that is unexplained and unexcused."). The Court noted, however, "[i]f the collective bargaining agreement does not allow enough time for investigation, the union can negotiate to lengthen the contractual time for filing grievances or to provide for extensions of time in particular cases." *Id.* at 1273-74.

Here, IBEW filed the relevant grievance on time. It was able to obtain a resolution on the merits notwithstanding any delays in the process. Neither PG&E nor anyone else has used the failure to process the grievance in a more timely fashion to deny a retroactive pay increase. IBEW's purported reason for delay is supported by investigation of the issue at multiple steps of the grievance process resulting in a thorough and in-depth resolution from the PRC on a complicated issue of contractual interpretation.

Accordingly, the Court finds that the failure to move more quickly through the steps of the grievance process, once filed, was not a breach of IBEW's duty of fair representation.

### 4. *Whether IBEW Breached Its Duty of Fair Representation by Failing to Pursue Arbitration*

Finally, Plaintiffs contend that IBEW's failure to escalate Grievance No. 21052 to the fifth and final step of the grievance resolution process in the CBA was a breach of the duty of fair representation. They contend that there is no evidence IBEW carefully utilized its discretion not to arbitrate by weighing competing interests when PG&E had already admitted liability and damages for the breach of the CBA.

It has long been established that "a union does not breach its duty of fair representation, and thereby open up a suit by the employee for breach of contract, merely because it settled the grievance short of arbitration." *Vaca v. Sipes*, 386 U.S. 171, 192, 87 S. Ct. 903, 918, 17 L. Ed. 2d 842 (1967) (reasoning that a CBA providing for grievance and arbitration procedure giving the union discretion to supervise the grievance process and to invoke arbitration gives both company

and union assurances that similar complaints will be treated consistently, and major problem areas in the interpretation of the CBA can be isolated and perhaps resolved). However, a breach of duty of fair representation may occur where there is no rational basis for the union's decision not to arbitrate. *See Johnson v. U.S. Postal Serv.*, 756 F.2d 1461, 1465 (9th Cir. 1985). "To constitute arbitrary conduct, omissions must be egregious, unfair and unrelated to legitimate union interests." *Id.* (citing *Robesky v. Qantas Empire Airways Ltd.*, 573 F.2d 1082, 1090 (9th Cir. 1978) (denying summary judgment on breach of its duty of fair representation claim where trier of fact could reasonably find that union's failure to disclose that grievance would not be submitted to arbitration was without rational basis or was reckless and extremely prejudicial and thus conclude that union acted arbitrarily).

Here, there is substantial evidence that IBEW weighed the risk of proceeding to arbitration and elected not to as a result of risk of obtaining a less favorable interpretation of the phrase "directly related clerical job experience." (Dwyer decl., ECF No. 159-5 ¶¶ 21-22, 34, 65, 74, 86). Although Plaintiffs disagree with the interpretation that IBEW agreed to at the Pre-Review Committee stage, Plaintiffs have not presented evidence that the Union believed it could clearly obtain a better interpretation at arbitration or was reckless in failing to pursue arbitration. IBEW's decision not to arbitrate was an appropriate and informed exercise of its judgment.

It is worth noting again that the CBA does not require arbitration for a decision to be final. The CBA provides that IBEW may request arbitration for "a grievance which is not settled at one of the steps provided above." (ECF NO. 159-2, p. 30). Here, Grievance 21052 was settled at Step 4 with the PRC Number 21052 Letter clarifying the guidelines' use of the term "directly related clerical job experience." (ECF No. 169-2, p. 265 ("This grievance is closed based on the above discussion and understanding.")).[5]

The Court holds that IBEW's asserted reasons for not escalating Grievance No. 21052 regarding interpretation of the CBA to arbitration were not without rational basis. IBEW did not

---

[5] The part of the grievance that was closed at that stage concerned the interpretation of the CBA. The letter states that "Any disputes as to 'related job experience' are remanded to the Local Investigation Committee for resolution." (ECF No. 169-6, p. 265).

breach its duty of fair representation in failing to arbitration Grievance No. 21502 and seek a more favorable interpretation of "directly related clerical job experience" than set forth in the Pre-Review Committee letter.

### 5. Conclusion Regarding Grievance 21052

The Court thus grants IBEW and PG&E's motions for summary judgment on Counts One and Eight to the extent they apply to Grievance 21052's interpretation of the CBA's provisions regarding "directly related clerical job experience." IBEW and PG&E followed the steps for resolution of this issue as provided in the CBA and received a final and binding decision under the terms of the CBA in the form of the PRC Number 21052 letter dated November 24, 2013. The fact that Plaintiffs disagree with the interpretation that resulted from the CBA grievance process does not allow Plaintiffs to litigate the issue again in this Court.

### B. Deciding Which Employees Have Sufficient Directly Related Clerical Job Experience Outside Grievance Process

The Court now turns to the issue of whether Plaintiffs may proceed with their breach of contract claim to the extent it alleges that PG&E breached the CBA's provisions to pay them higher wages even under the interpretation of the phrase "directly related clerical job experience" as clarified in the PRC Letter of November 24, 2013. As described above, PG&E and the Union did not follow the steps of the grievance procedure--including the Local Investigating Committee, Fact Finding Committee, or Review Committee--when it came to deciding which employees qualified for a wage increase. Instead, they determined between themselves which employees qualified based solely on employees' resumes, without input from any employee, without any reason given for the decision, using criteria not included in the CBA or PRC letter, and without allowing employees to file grievances.

### 1. Lack of Finality Under the CBA Terms

As an initial matter, the resolution between PG&E and IBEW does not comply with the CBA's definition of a final and binding under the terms of the CBA. Although the Union filed a grievance on the topic of "The Company has disparately applied the Pre Review Committee case 21052 decision to its employees hired into Call Center Operations starting on or about

1  12/15/2014," (ECF No. 159-2, p. 155), it never went through any of the steps of the grievance

2  process.  It is undisputed that grievances were not filed on behalf of any specific employee.

3  Indeed, IBEW prohibited any employee from filing such a grievance.  Although the PRC letter

4  resolving Grievance 21052 states that "[a]ny disputes as to 'related job experience' are remanded

5  to the Local Investigating Committee for resolution," (ECF No. 169-6, p. 265), there is no

6  evidence presented in this motion for summary judgment that such a procedure was followed or

7  that the Local Investigating Committee provided any input on the resolution of any employee

8  issues.  Moreover, the ultimate Settlement Agreement purporting to resolve the issue of which

9  employees were entitled to a wage increase under the newly clarified terms of the CBA was

10 signed by PG&E and the Union, (ECF No. 159-2, p. 160)--not anyone from a Review Committee

11 as was done in the earlier resolution (ECF No. 169-6, p. 265).  It is thus not final under the terms

12 of the CBA, which refers to "the resolution of a timely grievance at any of the steps provided

13 herein."  (ECF No. 159-2, p. 26).

14     While the document whereby PG&E and IBEW decided to resolve the issue purports to be

15 final, (ECF No. 159-2, p. 158 ("this Agreement is also a full and final compromise and settlement

16 and a general release of PG&E by Local 1245 that applies to all unknown and unanticipated

17 claims arising out of the implementation of PRC Decision 21052 and Business Manager

18 Grievance 23159.")), it is the finality provisions of the CBA that govern.  *DelCostello*, 462 U.S.

19 at 163–64 ("Subject to very limited judicial review, he will be bound by the result *according to*

20 *the finality provisions of the agreement*.") (emphasis added).  Moreover, this ad hoc resolution

21 outside the grievance procedure is not permitted by the plain terms of the CBA, which states

22 "apart from those matters that the parties have specifically excluded by way of Section 9.2,[6] all

23 disagreements shall be resolved within the scope of the grievance procedure."  (ECF No. 159-2,

24 p. 25)

25     Notably, neither PG&E nor IBEW explicitly state in their motions for summary judgment

26 that their determination of which employees were entitled to a wage increase was final and

27

28 [6] Section 9.2 explicitly provides that the grievance procedure is the appropriate method to resolve disputes involving "application of any of the terms of this Agreement."  (ECF No. 159-2, p. 26).

28

binding under the terms of the CBA. Rather, on this issue, they always point to the PRC letter resolving the issue of contractual interpretation, and gloss over the application to specific employees. For example, on the point of finality, PG&E's motion for summary judgment merely explains how the Grievance 21052 resolution, addressing the interpretation of "directly related clerical job experience," is final; PG&E provides no support for holding that the resume review process and application to specific employees as well:

> Early in this litigation, the Court could not "find at the pleading stage that the result of this grievance process was intended to bind all Plaintiffs without appeal to the Courts." (Dkt 31, 2:16-17.) Now, there is no dispute that the grievance resolution under attack by the Plaintiffs was "final and binding," precedential, and *with* prejudice under the collective bargaining agreement. PRC 21052 was resolved at (and not below) Step Four, the Pre-Review Committee. (JSUF 4, Exh. A, p. 28; PRC 21052.) Section 9.4 (Finality) provides: "The resolution of a timely grievance at *any* of the steps provided herein shall be *final and binding on the Company, Union and the grievant*. A resolution at a step *below Step Four*, while final and binding, is without prejudice to the position of either party, unless mutually agreed to otherwise." (JSUF 8; emphasis added.) Thus, the grievance resolution at issue here is "final and binding" for all purposes. *DelCostello*, 462 U.S. at 155 (applying hybrid Section 301 principles where "regional joint union-management committee" resolved grievance and union declined to proceed to arbitration; "Under the collective-bargaining agreement, the committee's decision is final and binding on all parties.").

(ECF No. 161, p. 16). In its reply, PG&E again points to the finality of the Step 4 Pre-Committee Resolution letter, and then, without explanation or legal support, claims that this shields the entire process. (ECF No. 175, p. 9) ("PRC 21052 is a final and binding Step Four grievance resolution. (Dkt. 161, 7:13-19 & fn. 7; 10:8-13.) The resume review process, settlement payee selections, settlement payment determinations, and the resolution of the follow-on grievance 23159, were all completed prior to the July 2015 commencement of this action."). IBEW similarly describes the PRC decision as "a final and binding resolution of the Grievance," (ECF No. 159-1, p. 23), but is silent on this point when it comes to the phase applying that decision to specific employees, (ECF No. 159-1, p. 24).

PG&E also claims that Plaintiffs admitted in the course of the motion to dismiss that Plaintiffs were only challenging the application of the Grievance 21502 interpretation and should

be held to that admission. (ECF No. 175, pp. 8-9) ("Plaintiffs' April 22, 2016, opposition to PG&E's motion to join Local 1245 states: "Plaintiffs do not dispute the resolution of the grievance process, nor the PRC 21052 Decision. (*See* Transcript from Hearing on Motion to Dismiss, 21:15-19 ['Your Honor, we're not contesting that process. We're not saying that the CBA didn't apply to the grievance and we're not saying that the determination of the grievance was erroneous'].) Plaintiffs' allegations arise from the improper application of the settlement agreement to the Service Representative I employees, which resulted in insufficient payouts." (Dkt. 49, p. 7 of 11, lines 1-7 [underline emphasis added].)"). In arguing that Plaintiffs should be bound by their admission, PG&E seemingly concedes that only the PRC decision was final and binding—not the application to specific employees.

In their opposition to PG&E's motion, Plaintiffs argue that both the PRC letter resolving Grievance 21052 and the subsequent resume review process were not final and binding under the law. (ECF No. 170, pp. 15-18). In support, Plaintiffs argue that "Grievance and arbitration determinations are not final when they leave issues undetermined or contemplate further action," and that Grievance 21052 and the Resume Review process were not final and binding because "[i]t is undisputed that PRC 21052 only determined that the Policy 'did not comply with the Hiring Guidelines,' and provided 'guidance in the application of the . . . Guidelines.' . . . It did not determine how the new definition of DRCJE should be applied to the grievants. Instead, it 'remanded [the issue of relief] to the [Step Two] Local Investigating Committee for resolution." (ECF No. 170, p. 16). Thus, Plaintiffs argue that because not all issues were resolved at Step Four and required a further process to decide how the interpretation applied to each employee, both the 21052 Grievance and subsequent review process were not final or binding and should not preclude Plaintiffs' claims.

After consideration, the Court finds that the Compromise and Settlement Agreement between PG&E and the Union, which purported to determine which employees were subject to the wage increase, was not "final and binding" under the terms of the CBA because it is undisputed that it was resolved wholly outside the grievance process. *See Vaca*, 386 U.S. at 185, 87 S. Ct. at 914 ("An obvious situation in which the employee should not be limited to the

exclusive remedial procedures established by the contract occurs when the conduct of the employer amounts to a repudiation of those contractual procedures"); *Sidhu v. Flecto Co.*, 279 F.3d 896, 900 (9th Cir. 2002) ("If the employer repudiates the procedures established in a CBA to govern a particular grievance, the aggrieved employee is relieved of the usual requirement to exhaust administrative remedies as to that grievance").[7]

The Court thus denies PG&E's motion for summary judgment to the extent that it argues that judicial review is precluded of a § 301 claim in Count One of the Third Amended Complaint to the extent it alleges that PG&E breached the CBA by failing to pay employees wages due based on their directly related clerical job experience, as clarified by the guidelines in the Pre-Review Committee letter of November 24, 2013.[8]

### 2. Whether IBEW Breached Its Duty of Fair Representation in Determining Which Employees Were Entitled to Wage Increase

The Court next turns to whether IBEW breached its duty of fair representation in purporting to finally decide with PG&E which employees were entitled to a wage increase based on their previous job experience.[9] It is worth noting that while IBEW's motion for summary

---

[7] There is also evidence that PG&E undermined the evaluation process by improperly withholding information that would have permitted evaluators to make more accurate determinations. IBEW representatives Arlene Edwards and Ed Dwyer, Jr. testified that they did not know that PG&E possessed data that would have permitted IBEW and PG&E to make more informed decisions concerning credit toward directly related clerical job experience. The data included information about the SR-Is obtained during the PG&E interview process, such as verified information contained in company databases concerning the applicant's qualifications and interview notes. Ed Dwyer, Jr. testified in his deposition that he specifically requested additional information from PG&E, but he was informed by Doug Veader (PG&E) that such data was "no longer available, that they had been destroyed…" (Dwyer depo., ECF No. No. 169-3, p. 1489-90). Plaintiffs, however, were able to obtain this data from PG&E during discovery in this case (long after the representations were made to IBEW).

The Court is concerned by these allegations and they may rise to the level of invalidating the entire process. *See Vaca*, 386 U.S. at 185, 87 S. Ct. at 914; *Dickeson*, 827 F.2d at 629 (9th Cir. 1987) (providing that an employee may be excused from the exhaustion requirement where he can show that "that the procedure was otherwise infected"). In light of the Court's decision regarding the lack of finality of the employee review process, as discussed above, the Court need not determine if this withholding of information would render the process infected. Nonetheless, the Court notes that these allegations provide further basis for the Court's decision.

[8] However, the Court disagrees with Plaintiffs that just because PRC 21052 resolution was limited to interpretation of the CBA, it too is not final or preclusive. As described above, that resolution followed the grievance process and resulted in a final decision at step four on the issue it addressed, according to the finality provisions of the CBA. The Court declines to hold that it is not final merely because it did not resolve the application of those guidelines to all employees. The Court's decision regarding Grievance 21502 explained above stands, notwithstanding Plaintiffs' argument here.

[9] Arguably, the Court need not address this issue in light of its finding above that the ad hoc determination of which employees were entitled to a wage increase did not result in final and binding decisions under the CBA (albeit using the interpretation provided in the Pre-Review Committee 21052 Letter). In light of that decision, Plaintiffs need not also prove that the Union breached its duty of fair representation to proceed. Moreover, the

31

judgment thoroughly defended the grievance resolution process, IBEW's motion for summary judgment is relatively brief in defending its conduct regarding the application to individual employees, stating:

> These claims are governed by the principle that "[a] union's [DFR] includes the duty to perform some minimal investigation [of a grievance], the thoroughness of which varies with the circumstances of the particular case." *Evangelista,* 777 F.2d at 1395. Thus, these claims fail as a matter of law, because there is no dispute that IBEW: 1) made extensive efforts to ensure that it secured from PG&E the resumes for *all* Call Center SR Is, and 2) reviewed every resume at least twice. DSUF ¶¶ 80-94.

(ECF No. 159-1, p. 31, footnotes omitted).

    a. *Legal Standards Regarding an Adequate Investigation*

"A union breaches its duty of fair representation if it processes a member's grievance in an arbitrary or perfunctory manner. To comply with its duty, a union must conduct some minimal investigation of grievances brought to its attention. The thoroughness with which unions must investigate grievances in order to satisfy their duty varies with the circumstances of each case. Although we afford unions a reasonable range of discretion in deciding how best to handle grievances, union conduct that shows an egregious disregard for the rights of union members constitutes a breach of the duty of fair representation." *Tenorio v. N.L.R.B.,* 680 F.2d 598, 601 (9th Cir. 1982) (internal citations omitted). Applying this standard, the Ninth Circuit in *Tenorio* held that the Union "showed a reckless disregard for [employees'] rights and breached its duty of fair representation" in that case because:

> The circumstances of this case indicate that the Union handled petitioners' grievance arbitrarily and perfunctorily. First, the record indicates that the Union departed from its policy of interviewing all discharged employees to obtain their story before processing their grievances. Because unions must adhere to rational decision-making processes, *NLRB v. General Truck Drivers*, 545 F.2d 1173, 1175 (9th Cir. 1976), the Union's departure from its policy causes us to inquire whether the Union had a legitimate basis for doing so. We find none. The Union had ample

---

Eighth cause of action, against IBEW, states that it is "in the alternative." (ECF No. 105, p. 47 ("In the event it is determined that the resolution of the grievance procedure precludes judicial review, Plaintiffs plead this cause of action in the alternative as a 'hybrid' claim.")). Nevertheless, given that the issue was presented in IBEW's motion for summary judgment, and because it is a legal alternate basis, the Court will address the issue here.

opportunity to ascertain petitioners' version of the pressroom conversation that led to their discharge.

*Id.* at 602.  Applying that standard, the Ninth Circuit in *Banks* similarly held that the Union in that case breached its duty of fair representation based on facts arguably similar to those in the case before us:

> Viewed in this light, *Gregg* and *Tenorio* control the resolution of the instant controversy. Indeed, Dorcas' decision not to interview or call as witnesses any Union employees is quite similar to the decision that we condemned in *Tenorio* as arbitrary: both ensured that no fair judgment of the validity of the grievants' underlying claims could be made. . . .

> We conclude that Banks has made a sufficient showing of arbitrariness based upon Dorcas' witness policy to survive summary judgment. In doing so, we are not second guessing the Union's assessment of the grievance's merits.

*Banks v. Bethlehem Steel Corp.*, 870 F.2d 1438, 1443 (9th Cir. 1989).

The requirement of a Union to conduct an adequate investigation was recently reiterated by the Ninth Circuit in the 2016 case of *Starla Rollins v. Community Hospital of San Bernardino*, 839 F.3d 1181, 1186–87 (9th Cir. 2016), in which the Court held that there was a material dispute of fact precluding summary judgment on the issue of whether the Union breached its duty of fair representation based on allegations that the Union failed to conduct an adequate investigation.  *Id.* at 1186-87 ("Rollins has submitted enough evidence that the Union processed her grievance "in a perfunctory manner" to allow her to survive the Union's motion for summary judgment").  The Court's reasoning in *Starla* provides some additional guidance:

> We recognize that Rollins has the heavy burden of showing that the Union's handling of her claim under the Seniority Agreement was arbitrary. *See Beck*, 506 F.3d at 879. Unions maintain "wide discretion to act in what they perceive to be their members' best interests," and we "accord substantial deference" to the Union's decision not to pursue Rollins's Seniority Agreement claim. *Peterson*, 771 F.2d at 1253 (citation omitted). At the same time, there is ample evidence to support a contrary conclusion—that the Union acted improperly by (1) failing to put Rollins's claim through the Union's own formal mechanisms for reviewing the merits of grievances, (2) improperly including Rollins in a class action grievance that did not raise her specific claim, and (3) providing weak or invalid justifications for rejecting Rollins's claim. A jury that resolves the factual disputes in Rollins's favor could find that the Union's treatment of Rollins's rights under the

33

Seniority Agreement was "perfunctory" at best, and therefore "arbitrary." *Peterson*, 771 F.2d at 1254.

*Starla Rollins v. Community Hospital of San Bernardino*, 839 F.3d 1181, 1188 (9th Cir. 2016).

Although a Union's judgment is ordinarily beyond question absent evidence of bad faith or discrimination, this deference does not extend to defects in the processing of a grievance, as the Ninth Circuit explained in *Banks v. Bethlehem Steel Corp*., 870 F.2d 1438, 1443–44 (9th Cir. 1989):

> As our discussion of *Gregg* and *Tenorio* makes clear, the line separating "procedural and ministerial" actions from those that require "an exercise of judgment" is, at times, indistinct. Certainly, the union in *Gregg* was making some sort of decision when it concluded that dropping a portion of its members' claims was warranted. Likewise, *Tenorio* involved a union's decision that interviewing employees to obtain their version of events before discharging them was unnecessary. Yet, under our rationale in *Peterson*, neither of these union decisions was an exercise of "judgment" and therefore immune from judicial review. Instead, both constituted procedural defects in the union's grievance process capable of supporting a fair representation claim. We can only conclude that the conduct at issue in *Gregg* and *Tenorio* constituted arbitrary union behavior because, in each instance, it placed the union in a situation where it either could not or would not make an informed judgment regarding the merits of individual claims.

*Id.* at 1443–44. The Ninth Circuit echoed this distinction between judgment on the merits and judgment in how to investigate a grievance in *Peterson v. Kennedy*, 771 F.2d 1244, 1254 (9th Cir. 1985):

> There are some significant general principles that emerge from our previous decisions. In all cases in which we found a breach of the duty of fair representation based on a union's arbitrary conduct, it is clear that the union failed to perform a procedural or ministerial act, that the act in question did not require the exercise of judgment and that there was no rational and proper basis for the union's conduct. For example, we found a union acted arbitrarily where it failed to: (1) disclose to an employee its decision not to submit her grievance to arbitration when the employee was attempting to determine whether to accept or reject a settlement offer from her employer, *see Robesky,* 573 F.2d at 1091; (2) file a timely grievance *after* it had decided that the grievance was meritorious and should be filed, *see Dutrisac,* 749 F.2d at 1274; (3) consider individually the grievances of particular employees where the factual and legal differences among them were significant, *see Gregg,* 699 F.2d at 1016; or (4) permit employees to explain the events which led to their discharge before deciding not to submit their grievances to arbitration. *See Tenorio,* 680 F.2d at 601.

> We have never held that a union has acted in an arbitrary manner where the challenged conduct involved the union's judgment as to how best to handle a grievance. To the contrary, we have held consistently that unions are not liable for good faith, non-discriminatory errors of judgment made in the processing of grievances. *See, e.g., Castelli*, 752 F.2d at 1482; *Dutrisac*, 749 F.2d at 1273; *Singer v. Flying Tiger Line, Inc.*, 652 F.2d at 1355; *Ness v. Safeway Stores, Inc.*, 598 F.2d 558, 560 (9th Cir.1979); *see also Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 571, 96 S.Ct. 1048, 1059, 47 L.Ed.2d 231 (1976). We have said that a union's conduct may not be deemed arbitrary simply because of an error in evaluating the merits of a grievance, in interpreting particular provisions of a collective bargaining agreement, or in presenting the grievance at an arbitration hearing. *See Dutrisac,* 749 F.2d at 1273. In short, we do not attempt to second-guess a union's judgment when a good faith, non-discriminatory judgment has in fact been made. It is for the union, not the courts, to decide whether and in what manner a particular grievance should be pursued. We reaffirm that principle here.

*Id.* at 1254. The Ninth Circuit also rejected the contention that a Union can avoid examination of the adequacy of investigation by claiming that it was a matter of "judgment" in the case of *Peters v. Burlington Northern R. Co.,* 931 F.2d 534, 540–41 (9th Cir. 1990), *as amended on denial of reh'g* (Apr. 23, 1991):

> Here, Peters has submitted enough evidence that the union processed his grievance in a perfunctory fashion to survive the union's motion for summary judgment. . . .
>
> We also note that the union's response to Peters's reading of the Agreement is not that it is incorrect, or indeed anything other than clear. Instead, the union merely cites to the judgmental/ministerial act dichotomy and states that its actions were necessarily and inherently a matter of judgment and strategy. In short, although we are mindful that it is Peters who has the burden of establishing the existence of a genuine issue of material fact, we find it significant that the union has failed to explain the basis for its failure to point the referee who heard the grievance to Article I, Section 7 of the Agreement. For Peters has provided enough other evidence to overcome any presumption we might normally have that a union exercises its judgment when presenting the substance of a grievance before arbitrators. Had the union explained its actions as the product of judgment, whether sound or flawed, we might very well have been forced to conclude that Peters on balance failed to prove the existence of a material factual issue. As matters now stand, however, we must remand because Peters had presented a triable question as to whether the union acted in a completely arbitrary, indifferent manner by failing to research the Agreement.

*Id.* at 540–41.

\\\

35

### b. IBEW Breached Its Duty of Fair Representation by Failing to Allow Input from Affected Employees

It is undisputed that the decisions regarding which employees qualified for the wage increase were based solely on the resumes employees had submitted in connection with their hire. Those resumes were made without any knowledge of the term "directly related clerical job experience," not to mention the clarification provided in the Pre-Review Committee Letter resolution. They thus listed prior job experience at a level of generality that, Plaintiffs claim, was insufficient to resolve the issues posed in those criteria. To the extent the resumes did not provide sufficient information to determine whether prior work qualified under the criteria for directly related clerical job experience, no additional information was ever requested from the employees. In fact, it was prohibited.

It is also undisputed that IBEW did not interview a single employee or otherwise allow the employees to give input as to their prior work experience. In fact, it is undisputed that there was an intentional decision not to consider any type of input from any employee. This decision not to interview or in any way obtain the position of affected employees precluded their ability to supplement their resume with information relevant to the question of their directly related clerical job experience. This omission was compounded by IBEW and PG&E's prohibition against filing grievances challenging their decision. The entire process precluded Plaintiffs from explaining why they believed they were entitled to a wage increase.

In its motion, IBEW claims that it had legitimate basis for not involving the SR-Is in the grievance process, and thus its failure to receive any input from employees did not render its investigation inadequate. IBEW representative Ed Dwyer, Jr. recalled that:

> We rejected this approach because we knew that after Grievance 21052 had been filed, there was considerable interest in and talk amongst the SR Is about the grievance and what types of prior job experience would qualify for a wage adjustment. … Concern was expressed that SR Is might revise their resumes to accentuate and/or exaggerate aspects of their employment to highlight or exaggerate prior experience which could be considered "directly related" to the SR I Call Center job, or to suppress experience with was not "directly related." Likewise, SR Is might adjust or exaggerate the dates of, or the amount of time spent in positions meeting those criteria so as to conform to the required 18 months of experience within 5 years of hire. With such temptations present, we would have no way to verify the accuracy of any amended resumes, short of

36

interviewing one or more prior employers of each SR I … Concern was also raised that, although Grievance 21052 applied to all SR Is at multiple Contact Center facilities, there would be unequal information or knowledge among these SR Is, regarding what types of prior experience would qualify for a possible substantial back pay payment and a prospective wage increase. Accordingly, some SR Is would have more information on which to amend their resumes to make them conform to the PRC 21052 criteria than others. Accordingly, if SR Is were asked or allowed to submit amended resumes, the parties might not be reviewing consistent information about SR Is' prior clerical job experience. This would be unfair to SR Is who were not "in the know." We agreed it would be unfair to request or allow amended resumes to be submitted because the parties did not have confidence that the resumes submitted would be accurate or consistent.

(Dwyer decl., ECF No. 159-5 ¶¶ 43-44).

IBEW uses named-Plaintiff Becky Greer as an example of confirmation of the concern that SR-Is would be tempted to alter their resumes for higher pay. According to IBEW:

Ms. Greer's resume submitted with her application for the SR I position, included the duty of "perform[ing] review of [Aetna] member claim history to ensure accurate tracking of benefit maximums and/or coinsurance/deductible," and Ms. Greer confirmed that everything in her initial resume was accurate. … Those duties – noting experience unique to a health insurance member services call center – are conspicuously missing from a later resume that Ms. Greer submitted to PG&E after Gracie Clark had informed SR Is at Fresno Call Center Unit meetings of IBEW's position in Grievance 21052.

(ECF No. 159-1, p. 32). IBEW additionally points to the admission by Plaintiff Saenz that, given the opportunity, she would include the language of PRC 21052 in her resume. (*Id.*)

Understandably, Plaintiffs take issue with IBEW's supposed "fear" that its members, armed with specific information about how their rate of pay would be calculated, would be tempted to mischaracterize their prior experience. There is no evidence that any employee has lied or even misled anyone about his or her prior employment or would do so. Presumably, there would be consequences, at least in terms of reputation, in lying to an employer about past experience. Moreover, IBEW's assumption that its own members would lie if asked to provide input as to their past experience is inconsistent with their duty to act in Plaintiffs' best interest.

The reasoning that, if asked to provide their past experience, employees would tailor their response to the revised definition of "directly related clerical job experience" is not a legally sufficient reason to exclude employee input. Indeed, the fact that employees would point

specifically to their directly related clerical job experience is exactly the reason to solicit their input. An adequate investigation includes obtaining the employees' argument regarding why that employee qualifies for higher pay under the CBA. Such an investigation would allow IBEW to best represent the employees' interests. IBEW could then potentially disagree with an employees' conclusion. But without asking an employee if they believed they qualified for a wage increase, IBEW cannot discharge its duty of fair representation.

Nor is the argument that there was unequal understanding of the issue among employees a reason to exclude their input. IBEW need only provide the guidance that resulted from the Grievance 21052 process to all affected employees to ensure that they were on equal footing. That decision was set forth in a brief written letter, which could easily have been circulated to affected employees.

Defendants' reasoning appears to boil down to the argument that, if employees were allowed to provide input, they may have justified higher rates of pay for more employees than apparent from the resumes. While this may be a reason for PG&E to attempt to exclude such input, and arbitrarily determine employees' entitlement to higher pay based solely on resumes, it buttresses the argument that IBEW violated its duty of fair representation by excluding employee input.

On the issue of whether resumes were truly sufficient to determine employees' qualifications for the higher rate of pay, Plaintiffs point to a January 2015 email chain involving IBEW officials commenting on the resume review process. Notably, Ed Dwyer, Jr. was the key IBEW representative during the grievance resolution and resume review process:

> From:      Dwyer, Fredrick (Ed)
> To:          Marston, Jenny
> Subject:   Re: Fresno Unit meeting
> Date:      Thursday, January 15, 2015 1:07:11 PM
>
> Different resumes, same PRC guideline. Yes
>
> On Jan 15, 2015, at 11:34 AM, "Marston, Jenny" <[…]@IBEW1245.com> wrote:
>
>> Do you feel that we considered the same document for everyone?
>> Jenny

On Jan 15, 2015, at 8:17 AM, Dwyer, Fredrick (Ed) <[…]@IBEW1245.com>
wrote:

Meeting with Doug on Friday, they already spent over $700k. It's going to
be hard to give up another chunk. They really screwed us and the
Managers/Supervisors knew it.
Really pisses me off. Also I don't believe all the members either.
Other than that I don't know how we fix it.
Ed

From:          Dean, Robert L., Jr.
Sent:          Thursday, January 15, 2015 8:09 AM
To:            Dwyer, Fredrick (Ed)
Cc:            Dalzell, Tom; Marston, Jenny; Osterlund, Joseph C
Subject:       Re: Fresno Unit meeting

What can/should we do going forward. If we can fix it we win 40 or 50
hearts and minds. No easy fix though.

On Jan 15, 2015, at 8:01 AM, Dwyer, Fredrick (Ed)
<[…]@.IBEW1245.com> wrote:
I went to the Fresno Unit meeting with Gracie last night after my
Selma Unit. There were about 60 members there, probably 40 who
didn't get the back-pay from the PRC decision on Exhibit 'A'.
The numbers are just a guess.
I think I have a better understanding on the real hatred towards the
Company and the Union and
I will try to break it down.
Three call centers closed; AT&T, Comcast and Aetna.
Managers and supervisors were hired from AT&T and Comcast. I
don't know the mix.
When CSRs were hired after the Company decided to interpret
Exhibit 'A' as gas and electric experience, no one at the Fresno
Center was hired above the $18.00 step even though the
supervisor/manager that reviewed the resumes probably knew or
should have known they should have been given the higher wage
step. Previously I said some were hired above the $18.00 step
which I now believe is not true. The decision to start everyone at
the $18.00 step was purely a money saving tactic. One member
stated to me that the Company told her over the phone when
scheduling the interview she would start at $24.00 and during the
interview the Company stated she did not qualify and would start at
the beginning step.
Another said the Company and/or the Union should have advised
them on the different steps so they could adjust their resumes???

1  Next comes the PRC decision and the task to look at these resumes
2  which were all over the board and hard to interpret as to whether it
   was within the Guidelines as described in the PRC 21052.
   The Labor Rep and the Business Rep did a good job in the
3  interpretations and what they could not agree on came to the Pre
   Review Committee. I had Jim, Karen and John of the Review
4  Committee look at all of the resumes that came to me for their
   interpretation. We differed on a few but for the most part we
5  agreed.
   Now there comes the sticky issue. The members who did not
6  receive the back-pay are stating, which is confirmed by some who
   received the award, that they did the exact same job but their
7  resumes were slightly different. In hindsight we should have
   involved the supervisors/managers to the meetings to confirm the
8  exact job duties.
   Doug and I did not use the job title as a reason to accept or reject
9  but rather the actual duties listed by the new hire.
   I believe some of the AT&T and Comcast new hires probably
10 qualify after listening to them at the Unit meeting. The Aetna new
   hires I don't think qualify.
11 For the 40 to 50 that did not receive the award at the rate of $20k
   would be $1 million. They are talking class action for disparate
12 treatment. I don't know how far that goes or if the Company or we
   want that issue. How much would that cost the Company?
13 I know this is long winded and maybe Gracie, Arlene, Rey and
   Bryan can give their perspective. There are some very disgruntled
14 members; some of course would rather see everyone get it or no
   one. Money brings out the beast.
15 Ed

16

17

18 (ECF No. 169-9, pp 25-27). One part of this exchange is especially worth emphasizing: Dwyer,

19 the IBEW representative, writes: "Next comes the PRC decision and the task to look at these

20 resumes **which were all over the board and hard to interpret as to whether it was within the**

21 **Guidelines as described in the PRC 21052**." This statement appears to concede that IBEW

22 believed at the time that the resume review process was inadequate to decide which employees

23 qualified for the pay raise. This piece of evidence alone is sufficient to preclude summary

24 judgment on the question of whether IBEW performed an adequate investigation to discharge its

25 duty of fair representation. According to IBEW at the time, reviewing resumes was not

26 sufficient.

27

28

Defendants also argue that the failure to consult with employees does not render an investigation inadequate as a matter of law. However, upon review, the cases relied on by defendants actually hold that a Union can settle a grievance without consent from the employee— not that it is acceptable to conduct an investigation without any input from the affected employee. *See, e.g., Shane v. Greyhound Lines, Inc.,* 868 F.2d 1057, 1061 (9th Cir. 1989) (holding that union did not breach its duty of fair representation where employees filed grievances, "Union pursued each appellant's grievance through successive stages, up to and including the selection of three-party arbitration panels," union settled without the grievants' approval, and there was no indication that employees were excluded from the process). Indeed, some of Defendants' own cases refer to how employees were consulted during the grievance process at issue. *See Plumbers and Pipefitters Local Union No. 520 v. N.L.R.B,.* 955 F.2d 744, 748 (D.C. Cir. 1992) ("The Step One meeting apparently produced no results. In October 1985, Hartinger, DeLuca and Berry traveled to the headquarters of the United Association in Washington, D.C., where they met with officials of the United Association in preparation for Step Two of the grievance process."); *Shuster v. Lockheed Aeronautical Systems, Co.* 935 F.2d 275 (9th Cir. 1991) ("It is undisputed that Shuster had a number of conversations with Edward Sandoval, the union business representative, about his grievance").

It is worth noting, however, that the Ninth Circuit in *Evangelista v. Inlandboatmen's Union of Pacific,* 777 F.2d 1390, 1395–96 (9th Cir. 1985) held that a Union complied with its duty of fair representation despite failing to interview the employee after she filed her grievance. The Court in that case distinguished the facts from *Tenorio* by finding that, "Moreover, extensive investigation by a union is unnecessary where it would not have resulted in the development of additional evidence which would have altered the union's decision not to pursue the grievance. Because resolution of Evangelista's grievance revolved solely around a question of contract interpretation, further investigation would not have aided the IBU." *Id.* at 1395-96 (internal citations omitted). Thus, in *Evangelista*, the Union had the benefit of the employee's position as set forth in her grievance, and additional information through an interview was not relevant to determining the issue. *See also Stevens v. Moore Business Forms, Inc.,* 18 F.3d 1443, 1448 (9th

Cir. 1994) ("The Appellants recite no facts discovered during their own 'investigation' which change the basic issues or make the union's reasoning suspect."). It does not control here where IBEW did not even have the benefit of a grievance setting forth the employees position and where Plaintiffs have at least raised a dispute of fact whether the employees had additional relevant information beyond their resumes.

PG&E also cites to the Ninth Circuit case of *Burkevich v. Air Line Pilots Ass'n, Intern.,* 894 F.2d 346, 352 (9th Cir. 1990), which held that the Union did not breach its duty of fair representation in failing to solicit employees' views before agreeing to a proposed reorganization plan in bankruptcy. *Id.* at 352. The Court finds that case distinguishable in that the Union there was taking a position on an issue affecting the entire company as a whole, and did not concern facts known to individual participants. In such a circumstance, the employees did not have unique information about their experience to inform the decision—the employees merely wished to be heard regarding their opinions on the plan. It is more akin to the Union agreeing to an interpretation of the CBA through the 21052 Grievance, as discussed above, than agreeing to application of the CBA to individuals' prior work experience.

Moreover, numerous courts have held that a union satisfied its duty to perform a reasonable investigation precisely because it solicited input from the affected employees. *See, e.g., Mills v. Intermountain Gas Co.,* 857 F.Supp.2d 1034, 1053 (D. Idaho 2012) ("The circumstances of this case, however, do not indicate the Union handled Mills' grievance arbitrarily and perfunctorily. Clay interviewed Mills. Clay had union representatives inquire about the vehicle accident history of other Intermountain Gas employees. Clay discussed with a long term employee what responsibilities Mills had and how he was required to perform his job. In light of these circumstances, the Court cannot conclude that the Union lacked an ample basis upon which to assess the merits of Mills' grievance."); *Smith v. Pacific Bell Telephone Co., Inc.,* 662 F.Supp.2d 1199, 1235 (E.D. Cal. 2009) ("In this case, the union did conduct an adequate investigation . . . . The union appears to have spent numerous hours interviewing witnesses, reviewing documents, and meeting frequently with Plaintiff and Pacific Bell regarding Plaintiff's grievances."); *Labuga v. Darling Intern., Inc.* 2010 WL 364330, at *9 (E.D. Cal., Jan. 22, 2010,

No. 1:07-CV-1807 GSA) ("Furthermore, Plaintiff's reliance on *Tenorio* is unavailing for the facts are clearly distinguishable. In *Tenorio,* the union failed to take any statement whatsoever from its members concerning a purported assault, whereas here, the union had but one statement to be concerned with: Plaintiff's statement that involved a simple matter of a flat tire."); *Wong v. Hawaii Medical Center-West LLC,* (D. Hawaii, Oct. 14, 2009, No. CIV. 09-00279JMS/LEK) 2009 WL 3294794, at *8 ("Union exercised discretion in its handling of Plaintiff's grievance by (1) having Union representative Figueroa speak with Plaintiff on May 8, 2008 about Plaintiff's work activities on May 6, 2008; . . . ."); *Day v. West Coast Fruit and Produce Co.,* 967 F.2d 585 (9th Cir. 1992) ("Although the Union's investigation of Day's discharge was minimal, it was not arbitrary because the investigatory meeting gave Day and witnesses to the incident an opportunity to present their version of the incident. Day has not shown that further investigation would have revealed any exculpatory facts."); *Slafer v. California Hyatt Corp,*. 927 F.2d 610 (9th Cir. 1991) ("In this case, the Union investigated Slafer's claim sufficiently to make an informed judgment. Union representative Mear met with Slafer initially to discuss his claims.").

Without arguing that it is a legally justified excuse, IBEW and PG&E also suggest that the process they undertook was necessary due to the time and difficulty of fully complying with the terms of the agreement. They suggest that it was far quicker to make a decision based only on initial resumes and agree informally between themselves outside the grievance process because to do more, including soliciting input from employees, verify background, or take disputes to the Local Investigating Committee under the grievance process would take too long. However, the difficulty in making employee by employee determinations appears to stem entirely from the CBA and contractual interpretation process itself, which were set by PG&E and the Union. After all, it was PG&E and IBEW who agreed to certain wage increases based on an amount of "directly related clerical job experience," which took a page of further explanation in the CBA to clarify. They could have chosen a much clearer and objectively easier-to-determine wage rate, based for example on years of total past work of any kind, or years in college, or without any distinction between SR-I wages at all. Then, when given a chance to clarify the meaning of directly related clerical job experience through the grievance process, PG&E and IBEW, with

input from the various Committees as part of the Grievance process, agreed upon guidelines that required a very granular understanding of the past work, including whether it included "identifying and resolving customer inquiries on all phases of customer service," and using examples to assist in a comparison of past work to other relevant types of work. The criteria were not intended to be simple or easily apparent from the face of a resume. Given that the CBA terms, especially as interpreted by Grievance 21052, contemplated a factually specific evaluation of prior work experience, it should go without saying that an adequate investigation would also take a substantial amount of time and consideration.

In sum, in the context of determining which employees has past experience that would qualify for a higher pay rate, where employees had unique information that would help the investigation, where the IBEW representative wrote at the time that the resumes were insufficient to determine their qualifications, where employees were prohibited from filing grievances that set forth their position, there are sufficient facts that IBEW breached its duty of fair representation by conducting an inadequate investigation to preclude summary judgment.

### c. IBEW's Agreement to Restrictions Beyond Those Set as a Result of the Grievance Process

It is also undisputed that IBEW agreed to narrow the employees entitled to the wage increase by imposing additional criteria beyond that set forth in the CBA and PRC 21052 resolution. Indeed, IBEW's own motion asks for a determination that it did not breach its duty of fair representation by "[a]greeing with PG&E not to credit experience accrued more than 5 years before an SRI's date of hire as experience constituting DRCJE." (ECF No. 159, p. 3). It is undisputed that there is no such limitation in either the CBA or the Pre-Review Committee resolution letter as to Grievance 21052. On the contrary, the plain text of the CBA contemplates credit for directly related clerical job experience more than 5 years prior to the hire date when it states "Credit for work experience will not be given for jobs held prior to a five-year break in employment." (ECF No. 105, p. 140). This provision, which appears in the CBA itself in relation to the "hiring guidelines [that] apply to clerical employed under the Agreement" would be unnecessary if experience before 5 years was entirely excluded from consideration. Similarly,

the PRC reiterated in its resolution letter that examples of directly related clerical job experience include "work experience, which did not precede a five-year break in employment." (ECF No. 169-6, p. 264). The Union's decision to agree to exclude all work before five years is thus directly contradictory to the contractual requirement to evaluate any relevant experience "which did not precede a five-year break in employment." In this way, IBEW agreed to an additional limitation that was not present in, and contradicts, the CBA itself.

The Court has not located any case addressing when a Union agrees to alter the terms of the CBA, not to mention outside the grievance process. Certainly the Court has not found any case blessing such conduct or deeming it compliant with a Union's duty of fair representation. In one case, the Ninth Circuit determined that a Union complied with its duty of fair representation in part because its actions complied with the CBA. *See, e.g.*, *Wellman v. Writers Guild of America, West, Inc.,* 146 F.3d 666, 671 (9th Cir. 1998) ("On the other hand, when a union is confronted with more subjective issues about which the collective bargaining agreement or union policies are silent, and which are sufficiently novel that no practices have developed to cope with them, we are more likely to find a union's judgment at work. . . . As a preliminary matter, we note that Wellman is not contending that the Board's actions deviated from the terms of the collective bargaining agreement or the policies adopted to implement it."). It follows that a Union may breach its duty of fair representation when it deviates from the terms of the collective bargaining agreement, especially after the Union had just participated in a Grievance process resulting in a decision regarding the interpretation of the contract that did not include such limitation.

The same conclusion follows from IBEW's decision of "[a]greeing with PG&E not to credit prior sales experience as experience constituting DRCJE." (ECF No. 159, p. 3). Again, this was a limitation not present in the CBA or the additional guidance in the PRC decision. This additional limitation similarly contradicts the CBA, which states that "In applying paragraph 1 [which discusses wage increases due to directly related clerical job experience] credit will be given for office clerical work, 'office clerical work' does not include: (a) sales work in any type of retail establishments . . . ." An exclusion for sales work for retail establishments would make no sense if all sales work were excluded. Rather, it implies that other relevant sales work would

45

count as directly related clerical job experience.  Agreeing to such a limitation, and forbidding any employee from filing a grievance contesting that limitation, is further evidence of a breach of the duty of fair representation by IBEW.

### d.  IBEW's Failure to Provide Any Reason for Its Decisions

Another factor relevant to whether a Union's investigation is adequate is whether the Union provided a rational basis for its decision.  *See e.g., Stevens v. Moore Business Forms, Inc.,* 18 F.3d 1443, 1448 (9th Cir. 1994) ("Here, the union provided a "rational basis" for its decision not to pursue the Appellants' grievance. This is not a question of the union's failure to perform a purely administrative or ministerial task, such as the timely filing of a meritorious grievance. Rather, this is a question of judgment, a "rational attempt[ ] on the part of a union to properly interpret a collective bargaining agreement or otherwise handle a grievance."); *Peters v. Burlington Northern R. Co,.* 931 F.2d 534, 540–41, (9th Cir. 1990), *as amended on denial of reh'g* (Apr. 23, 1991) ("If a union provides an explanation for having ignored a particularly strong argument during a grievance procedure that is based on reasoning, we will not question whether the reasoning was faulty or not.").

Here, IBEW provided no reason whatsoever for the decisions it made regarding which employees were entitled to the wage increase.  For each of the named Plaintiffs, IBEW points to a spreadsheet it used to track its review. (ECF Nos. 159-24; 159-25).  The spreadsheet contains 898 rows and columns for "hire date, employee number, employee name, employee LAN ID, current employee status, work location, needs review, qualified for 18 month step, step, union position 3/30, resume, prev employer, job title, length of service, duties, notes."  The spreadsheet very seldom states a reason why any particular SR-I was granted or denied a wage adjustment.  It does not appear that this was the purpose of the spreadsheet. It was used primary as data tracking mechanism. Thus, there does not appear to be any document that IBEW could point to that would explain its reasoning *at the time of the evaluation* for denying a particular SR-I a wage adjustment.  While IBEW sets forth various post-hoc reasons for certain persons in its motion for summary judgment, these may or may not be the reasons it decided to exclude the employees *at*

*the time of the evaluation.* Indeed, IBEW was forced to re-evaluate its decision for each of the named Plaintiffs in the motion for summary judgment by looking to the resume and cross-referencing the spreadsheet to explain why a particular *may have been* denied a wage adjustment.

The Court has not seen any case holding that a Union complies with its duty of fair representation for failing to pursue, not to mention prohibiting, a grievance without providing any reason at all for its decision. Indeed, it suggests that there may not have been a rational basis for the decision. At the very least, there is a dispute of fact whether IBEW exercised a rational basis for its decisions to deny wage increases to certain employees.

> e. *Conclusion Regarding Breach of Duty of Fair Representation for Determining Which Employees Qualified for a Wage Increase*

While the Court is cognizant of the deference courts give to Union decisions, the facts of this case are an extreme departure from Union investigations upheld in the case law. The Court has not seen any case blessing this sort of conduct—with insufficient information to determine the relevant questions, without any input from employees, without any rationale given, without allowing any grievance process, and using criteria explicitly beyond the contract.

All of these facts taken together preclude Defendants' Motions for Summary Judgment as to Count Eight as it applies to the determination of which employees were entitled to the wage adjustment under the CBA as interpreted by the PRC decision.

For the same reason, Defendants' Motions for Summary Judgment to the extent that it argues that judicial review is precluded of a § 301 claim in Count One are denied as to the determination of which employees were entitled to the wage adjustment under the CBA as interpreted by the PRC decision. Employees may proceed with their breach of contract claims against PG&E to the extent they claim they were not paid according to the CBA, as further clarified by the Pre-Review Committee letter.

\\\
\\\
\\\

## II.    CONCLUSION AND ORDER

For the reasons set forth above, the Court grants in part and denies in part Defendant IBEW Local 1245's Motion for Summary Judgment (ECF No. 159) and Defendant PG&E's Motion for Summary Judgment (ECF No. 161) as to Counts One and Eight of the Third Amended Complaint as described in this order.[10]

Within 14 days from this order, each party shall submit a supplemental memorandum, no longer than 10 pages per party, regarding which if any remaining part of the summary judgment motions they intend to pursue consistent with this order with an explanation regarding why summary judgment on the other causes of action is appropriate notwithstanding the rulings in this order.

IT IS SO ORDERED.

Dated:    **September 11, 2017**          /s/ *Erin P. Grier*

UNITED STATES MAGISTRATE JUDGE

---

[10] Arguments concerning SR-Is hired into PG&E's local offices were not reached as Local office SR-Is were not included within the scope of Grievance 21052, and it does not appear that Defendants are arguing that the grievance process ever concerned local office employees. Named Plaintiffs were not hired into local offices. (ECF No. 159-2, ¶¶ 21 (Markwith), 23 (Greer), 25 (Budnik), 27 (Saenz), 29 (Carty), 31-32, (Pesina)). To the extent local office SR-Is become part of the case, the Court will allow argument regarding the preclusive effect of the grievance procedure as to such Plaintiffs, but it is not before the Court at this time.